Flanagan, et al. v. Girl Scouts of Suffolk County, Inc. et al., Emily Brown, and Pamela Mastrada. Thank you. All right, Mr. Bergstein, you're reserved three minutes for a following debate whenever you're ready. Okay, thank you. Good morning. Stephen Bergstein for the Plaintiff Appellant. I want to start with the whistleblower claim under the New York not-for-profit law. Rule 12 dismissal was improper. The plaintiffs make out all the elements. And let me start with protected activity. There does not seem to be an argument that the letter from July of 2020 was not protected activity because it identifies serious problems at the Girl Scouts. And the district court did not say it wasn't protected activity. Let's turn to causation. We have both circumstantial evidence of causation and we have direct evidence of causation that's in the complaint. Let me start with the circumstantial evidence. We have a steady stream of adverse actions against the plaintiffs. Not too long after they submitted the letter, starting with maybe three or four months after the letter was submitted in September 2020, Grant was falsely accused of a technology problem that looked to be a setup, according to the allegations in the complaint. There was additional protected activity in October 2020 when Moffitt and Grant sent further emails to HR about Mestrota's retaliatory treatment. By the end of 2020, plaintiffs' wages were cut by 40% and their titles were reduced without a reduction in workload. So then in the following June, after failed negotiations on severance and it was agreed plaintiffs could continue working for the agency, they were fired. So under due plan, you have a steady stream of retaliatory acts. But equally important, and this was not emphasized in our brief and I apologize for that, but it's in the complaint. There is some direct evidence of retaliatory intent. March of 2021, Severino told Flanagan, one of the plaintiffs, the board feels threatened and you don't know what they'll do when they're threatened. And it will be difficult working with the board going forward. And your whistleblower actions will follow you throughout Long Island and other non-profits. So to the extent there's any concern about the circumstantial evidence, maybe it's too long a time gap. Putting that aside, if you have direct evidence of retaliatory intent in the form of these comments, that is enough to survive a Rule 12 motion to dismiss under this court's cases, which we all know do not impose a heavy burden on the plaintiff in claiming retaliation, both in Title VII and presumably under the New York State Whistleblower Claim. The district court dismissed the Whistleblower Claim solely on the basis that the Girl Scouts had a whistleblowing policy and they complied with it. Now- Well, so, but your point, I guess, is that they complied with it in the sense of having a policy in place. Correct. And sort of monitoring it, but they didn't enforce it. Is that your point? That's exactly my point, that the statute requires implementation and compliance. And those two terms necessarily have a different definition if they're in the statute together. So having one in place doesn't get you off the hook in a retaliation claim. But they didn't comply. But even if they did comply, even if they had a good faith investigation, how does that get around the prime and facial case? You can have a good faith investigation into their complaint and still retaliate against the plaintiffs. So that's where the district court, with all due respect, got it wrong. And I don't- No, it's not like a defense that if I have a plan in place, then I'm home free. That does arise sometimes in the discrimination area. Farragher and Ellerth, I think, is the name of the case. But this is not that kind of a situation. Correct, because Farragher and Ellerth are not retaliation cases. No. And I don't think the law even supports the proposition that mere implementation and compliance with the policy entitles the defendant to a Rule 12 dismissal. There's a few cases that address this. Joshi seems to be the main case. But even Joshi doesn't go that far. And in Joshi, ultimately, the plaintiff lost because this court found there was no retaliation in the end. It wasn't simply because there was an investigation. Let me jump to the racial discrimination claim on behalf of Grant. In Grant, you have Mistrada starts working for the agency in April 2020. For some reason, she is immediately focused on getting rid of Grant, even though she doesn't know him, and says he's unqualified, he's overpaid, and the only reason he got the job is because of his mother. You have some stereotyping here. This is before anybody ever investigated or inquired of Grant. Correct. Correct. So you have this irrational focus on getting rid of Grant, and then you have stereotyping. Mistrada tells Flanagan, be careful with Grant. The mother was a former CEO. Was she of this organization? Mistrada? No, I'm talking about Grant's mother. His mother was a previous CEO. CEO, yeah. Right. So presumably, Mistrada was drawing conclusions based upon her knowledge of Grant's mother, or something about Grant's mother was influencing her. Something like that. That's what the complaint says. But let me get into motive. What's going on? Why is Mistrada doing this? Well, we have some stereotyping comments here about Grant, telling Flanagan and the HR director, be careful with Grant. He could get angry and destroy the property. Is that stereotyping? Well, it sort of implies that he's a black man. Be careful. He's dangerous. He's not busy enough. He's not doing enough work. So you're getting into dangerousness. You're getting into he doesn't work very hard. You also have disparate treatment. Summer 2020, this is Joint Appendix 37, Paragraph 61, a comparable white employee, also managed no staff, still retains his managerial title and his compensation, and he did not suffer a loss in pay the way that Grant did. So under little John Vega, cases like that, that should be enough to repel a Rule 12 motion and allow the plaintiffs. In terms of the reduction of pay, my understanding is that the 40%, he was the only one that got that level of reduction other than Flanagan, who you allege was defending him. Retaliation. Was that accurate? Yes. Yes. Thank you. He also said that he was lazy, overpaid, and incompetent, an incompetent beneficiary of nepotism. He might have been a beneficiary of nepotism, but these are all statements that she made before she knew anybody had investigated. Correct. Just off the top of her head. Correct. That's the problem. So why is she making comments like this if she doesn't know him? And the inference is, well, it could be a number of inferences, but one inference is that it's stereotyping, and that would be enough to— You also allege not that she obviously didn't know him, but she hadn't done any review at that point. It was the first week she comes in, and she says he's going to be terminated within three or four months. That's right. Without any review of his performance, of his job, the duties of the job, right? That's right. All right. Thank you. Mr. Schlossberg. You can lower that if you want to. No, no, no. There's a switch right there. I'm good. The podium? Yeah. CSO will help you. I'm good. I'm good. I'm good. It'll help me because I'll hear you better. Okay. Go ahead. Thank you. When? Well, it's up to Your Honor. I can see fine. Good morning. Good morning. May it please the Court. My name is Jeffrey Schlossberg, Jackson-Lewis PC for Girl Scout Suffolk County and all the individuals except Mastrada and Brown. I want to start by addressing what the counsel has called the whistleblower claim under 715B. I think that the record will show, I mean, we have an amended complaint of 243 paragraphs and 60 pages, very detailed. And in this amended complaint, they talk about that the Girl Scouts spent $60,000 on a law firm to investigate their complaints, that they were subjected to hours of questioning, that they were forced to recount and relive the details and provide details, and that they received a list of document requests and that a lengthy investigation occurred. Okay? I think there's ample allegations in the complaint to support that the Girl Scouts complied with the requirements of 715B, which only requires that they have a policy and implement it. And under Joshie and the statute, they were- But under the A, it talks about compliance. It says, shall adopt and oversee the implementation of and compliance with a whistleblower policy to protect from retaliation. So why doesn't that include, you know, actually making sure that someone is not retaliating and is not just doing a report? Well, we can do the retaliation that's separate. I mean, I'm talking about the first part is having and implementing the policy, right? So if we want to talk about retaliation, I can address retaliation generally because it applies to many of their claims. You're suggesting that under this particular provision, I understand there's other retaliation claims, but under this particular provision, as long as you have a policy, there's no claim, right? Well, I think that that- If their argument is, then why is the word compliance in there? If all you have to do is implement a policy and that's all this is intended to do, why would they say compliance? Well, I don't think the court has to get there, Your Honor, because I think their own allegations show that there's compliance. All the things I just read to you from the amended complaint- I took your answer to be that they had, by hiring the law firm and going through the rigorous questioning and various examination of the evidence of which the plaintiffs themselves counter-note in their complaint, this was compliance with their own policy, there was an investigation with regard to the complaint. That's correct, and I think the statute says that just by having the policy, even though here they went more, so we don't have to get to it, it says that it will be deemed in compliance. In A, it says the policy shall provide that no director, and it goes on to list the number of people, will take any action where an employee will suffer intimidation, harassment, discrimination, or other retaliation. Well, that's what I said, Your Honor, I can address the retaliation. We have compliance with having a policy, which is what the statute says on its face. Now, if you want to talk about actions- I'm sorry, you're missing my point. I'm sorry, Your Honor. My point is that if it says that that policy has to include a provision that prevents a person from suffering any type of retaliation or intimidation, then why isn't, and it says that you have to have compliance with that policy, why doesn't that include an allegation, then, that there was some retaliatory conduct in violation of the policy? There is an allegation. In our summary order, we refer to the fact that they adhered to the policy, so at least implicitly in that case, we were looking at not just whether they had a policy on the books, but whether they followed it. And just hiring a law firm and issuing a report, at least under the language of the statute, may not be sufficient, right? Well, I think it is sufficient to comply with having the policy and implementing- But the question is whether there then was retaliation. Exactly. Because regardless of what the law firm found, did the Girl Scouts then go and do something to the people who were the complainants? Exactly, and that's the second part of the analysis. So you're saying that the fact of retaliation, in fact, doesn't mean that they weren't compliant up to that point? 100%. If there was retaliation, it comes in as a retaliation case, not as a 715- That's right. The breach of 715B, a right of action, is whether they had the policy and complied with it. On the substance of the retaliation claim, why don't you address that? Okay. Why is there not sufficient evidence of retaliation? Well, because of the examples that counsel gave this morning- Allegations, I should say, not evidence, allegations. The allegations that counsel gave this morning, under applicable standards of what constitutes a retaliation, they don't rise to that level. I mean, we're talking about an allegation that he didn't perform his job well, or that they sent emails to HR under applicable standards about whether it failed to dissuade someone from, a reasonable person, from filing a claim. You know, there are cases that would say that, you know, allegations that you didn't perform your job is not enough. They all got terminated. Oh, okay. Well, that's a different issue, because he's- that's in June. And he mentioned interim allegations, and I thought the court should really understand that the interim allegations between July of the letter and the termination, that I wanted to be sure the court understood that those don't rise to the level of retaliation. Well, it seems like an unusual situation. Maybe you can help me. I know it's only a complaint, but they allege that they're told you're not going to be terminated by the defendant's counsel at some point. Initially, there was this idea, maybe they would get a separation agreement of some type. They say they're told they're not going to be terminated, and at some point, plaintiff's counsel advises the Girl Scouts, like, they want to stay. And then a month later, they're terminated. So, I don't know, that seems pretty unusual to me, where you're told you're not going to be terminated. They say, we want to stay, and then a month later, they're terminated. Not exactly the timeline. The first thing that's happened was in March of 2021, plaintiff's counsel sent a letter stating, we want out, and here are our terms. And then there were ongoing negotiations. And during those negotiations, based on good faith, they weren't intended to be terminated while the negotiations were going on. But ultimately, the negotiations didn't work, as things happen, and they pulled out. They said, thank you for your time. They're done. And so, once the negotiations were done, having had someone tell you they don't want to work there, and they want ransom. So, you're saying that you're not going to be terminated, it was simply during the negotiations? I didn't understand that from the complaint. Yeah, if you follow the timeline, then that's exactly when it happened. During the time. I think their employer would be told that their employees are ready to leave, and then be told that they couldn't ever terminate their employees because their employees previously were ready to leave. Exactly, Your Honor. I mean, if someone's unhappy and says, I want a $100,000 raise, and you say no, then you have an unhappy employee there. And why wouldn't the employer be able to say, look, you're unhappy, we're not giving you $100,000, you should leave. Your time's almost up. Okay. I want to clear something up. Prior to the filing of the letter, a number of things happened to some of the employees that relate to the racial discrimination or the discriminatory claims. But those don't fit within the whistleblower claim, do they? Because they occur prior to the whistleblower letter? Like some of the reductions in salary in some of the other events? Well, correct. Exactly, I mean- So to measure the retaliation, I mean, the letters, the events that occur have to occur post-letter. If for the retaliation, absolutely. Right. What's in the letter would be allegedly if you're looking at protected activity. Because I heard the opponent of broader listed that from a temporal standpoint, to my mind, some of them preceded the letter, and that's what I wanted to make sure. I agree, they could not be that. Let me ask you to address the discrimination claims. Thank you, yes. Let me just frame it for you. It's just whether there's a plausible discrimination claim or not. New CEO comes in. He's been there close to 20 years, right? He's the director of technology, correct? Yes, Mr. Graham? Yeah. Yes. Within a week of taking the job, she says he's going to get terminated within a few months. They allege, I don't know whether, you know, that he was not spoken to. There was no review. His salary is reduced by 40%, which they say is a higher reduction than anybody else other than Flanagan, who defended him. His title gets stripped because he has no staff, even though there's a white training manager who had no staff who retained her title. And then there are these various things that happened at the meeting. You know, he's spoken to in a way and singled out for lack of performance, even though they say that it wasn't true. And then there's the allegations that he's going to destroy property. Watch out for him. So the question is, do all those things together state a plausible claim that he may have been terminated based upon his race? No. Why is that not sufficient? That's not sufficient, Your Honor, and I'll point the court to two cases. Humphreys v. City of New York, which is cited in our brief, where the court said that pejorative words likened to angry black women syndrome. You're taking one thing, you're taking one of the, put aside the reference to he might destroy things. You have an African American employee who's been there for 19 years, who a decision is made within a week of arriving, he's gone. Without any review of his performance, I mean. There's no, I guess the simple answer, Your Honor, is there's no because of discrimination component here. Someone comes in, there's a new marshal in town. They're allowed to do things. They're at will employees. If it's because of nepotism or if it's because the new person doesn't think- Nobody else, did she come in and say I'm going to terminate these white employees too? I don't think, he got the biggest reduction of 40%. Yes? Well, equal. No, Mr. Flanagan got the same reduction. No, but Mr. Flanagan, when we went to 40%, they allege after he defended him, Mr. Flanagan was at 30%. He defended Mr. Grant. They say then his went up to 40%. That's their allegation? I think that's a conclusory allegation and that the district court analyzed it properly in that you have these facts and the bottom line is they can't connect its speculation whether or not that was because of his race. If you look at the Diaz versus Poly Prep case from the Eastern District, where it's like just because Mr. Grant is a black person and something bad happened to him, doesn't mean it's because of his race. What about the taking away his title? Again, under-  What about that? Under applicable law, under analyzing discrimination in terms of whether that's an adverse action- No, no, no. I would say- I'm not suggesting that's an adverse action in itself. He got terminated, but the fact that he was stripped of his title along the way on the ostensible reason that he had no staff, when they say there was a white training manager who had no staff, who she did not strip of the title, so it's not an adverse action in itself, but you said there's no evidence that this was because of race. They're suggesting, well, what happened with respect to the stripping of the title? There's no explanation for why he was treated that way versus the training manager. Your Honor, my only answer to that is that the stripping of the title resulted in no monetary impact at that time and that that's not sufficient to make up part of a discrimination claim. Are adverse actions alone enough to imply discrimination? What do you mean enough? Alone. I'm sorry. If Mr. Grant had been white, would someone be able to conclude that he was being discriminated against based on his race? No. So it's the fact that it was he the only African-American employee that was let go? I don't think so, but I may be wrong on that. But there is a problem, it seems to me, where she's commenting before any investigation or before she's ever even gotten a no grant or that he's making crazy money for his role, he's lazy, he's incompetent, et cetera. Taken by itself, that could be seen as being stereotyping, couldn't it? And would that be sufficient to get past a motion to dismiss? I think that's a reach, Judge Walker, to say that that's stereotyping because he happened to be black. I mean, I think that almost borders on if you say someone's lazy or angry and they're black, I mean, that's almost, if somebody said that that would be stereotyping the other way around. In other words, to make that argument is almost stereotyping. In her conclusion that he was not performing, he was not working hard, not performing, underqualified, all those things that they alleged that she said coming in, what was her basis for that one week into the job? Well, I think that a lot of things were happening during this COVID time, and I think it's all put out in their amended complaint, the 200 plus paragraphs, and that under the law, they have to allege insufficiently on a pleading that it's tied to discrimination. And I think that what we're doing is you're taking facts and saying that because they happened to a black person, that those must be- Only to the black person. Well, but everybody else was later fired. Who else in her first, if she had come out of a list the first week, these five people were going to be fired, and there were white people on that list, you'd have a different argument potentially, but we don't have that. There were other people, obviously, who were terminated, but there's no allegation in the first week she decided to terminate anybody else except him. Well, one of the things that you could look at, Your Honor, is the allegation that he was there because of his mother. I was going to say, is nepotism a protected class? No. Correct, Judge Wesley. Are some of the things that she was characterizing about him related to nepotism? I think in part, I mean, if you look at the complaint, and again, we haven't done any- So we're supposed to look, we're supposed to, at the motion to dismiss stage, say that was the non-discriminatory reason was nepotism, and dismiss the case based upon that was the ostensible non-discriminatory reason? I think it's- We've had multiple cases- We have to conclude- I know. I'm sorry, Your Honor, I'm sorry, I'm not sure. We have to conclude the termination without anything else, without an evaluation or anything else, that that simple fact, the termination, is some fact of discrimination. If you want to find for the appellants, correct. All right. All right, thank you both. Thank you. Mr. Freer. Good morning. May it please the Court. Richard Freire of Palinger Militarado for Defendants Mostrada and Brown. And I'd like to pick up where Your Honors were just discussing, and specifically, if I'm not mistaken, I don't believe there is any allegation that Mr. Grant was ever actually called lazy. I think the quotes were that he's not busy enough, that he makes too much money, and in the context of a reduction in his pay as well as the elimination of his title, that he, quote-unquote, could get angry and then destroy property, including its computer systems and infrastructure, because he had been the director of IT. None of those comments, either taken by themselves or collectively, rise to any sort of racial connotation. So what we have instead is what Your Honor suggested, that by the mere fact that an African-American man was terminated or that this person came in, my client, Mostrada, came in and had already determined that he would have to go, that that is attributable to some sort of racial animus. However, there are no facts that are alleged that would support the racial animus, separate and apart simply from his being terminated or her intent to have him terminated. Well, the reasons given, I mean, the argument they're making is that the reasons given were, in effect, stereotyping an African-American as lazy, not competent. But there wasn't lazy. Could get angry is an obvious comment to make, that someone could get angry at the idea that they are going to lose their title or their job. The destruction of property, specifically computers, is tied specifically to what he did in the company, which was IT. The idea that he's not busy enough is consistent with Mostrada's- Again, I think you're doing the same thing your co-counsel did. You're taking one piece of it, but we look at it all together. And the allegation here isn't that he made a plausible claim because he was terminated. The allegation is he made a plausible claim because she came in and, without examining his performance at all, decided that he was the one, out of all the employees, that he was the one who was definitely going to be terminated. She reduced his salary more than anybody else. Let me finish. He reduced his salary more than anybody else. She's changed his title. The reason she came for changing his title was he's not managing staff. He shouldn't have a manager title. And there's a white employee who doesn't have any staff who didn't lose the title. And then there are the allegations that you say she didn't use the word lazy. He's not busy. He's not busy enough. He's making too much money. Again, they're saying without any review. So what makes it implausible? Maybe nepotism is in her mind. What makes it implausible that it was because of his race? What's so implausible about that? It is because, under Plaintiff's own facts, it is clear that the allegation was that he came in, that Mistrada came in, and based on his relationship to the former CEO, who she was now replacing, she was coming in with some sort of preconceived notion about the value of his job and the time that he had spent there and whether or not he needed to be there at that salary. That has zero to do with his race. There's not even a single fact alleged of ever an epithet or an actual codeword or dog whistle word as recognized by this court. So you know that we have dozens of cases that don't have an epithet where we let it go forward because there's a plausible claim, which we say is a minimal burden, a minimal burden to state under Title VII to state a plausible claim. And you have unequal treatment. You have allegations of unequal treatment. You have allegations of whatever ostensible reasons she gave of him being not busy enough, underqualified, that it wasn't based upon any type of evaluation. Your Honor, I rest on what we've already discussed. I will lastly point out, though, in the short time I have, that as to my clients Mistrada and Brown, the retaliatory adverse employment action, i.e. the termination, occurred well after my clients had already left GSEC. How much time was it? GSEC. Was it ten months? It was seven months, I believe it was.  Yes. Where does that fit in in terms of the cases that talk about the relative immediacy of the adverse action? I would submit to the court that it breaks the liability of the individual defendants for the actions of my co-defendants several months later. And, in fact, it's supported by the facts alleged that the conversations or discussions regarding separation occurred well after my clients had already left. Thank you, Your Honor. Thank you. Thank you. All right, Mr. Bergstein, you have three minutes to rebuttal. Defendants have not addressed the allegation in the complaint at page 5556, paragraph 134, that goes beyond circumstantial evidence of their retaliatory intent for the whistleblower. It's direct evidence that Severino, the CEO, is essentially telling the plaintiffs, all of you are in trouble because of the whistleblowing letter. And she mentioned the whistleblowing when she spoke to Flanagan. And they're fired, you know, not long after that. Well, the following year later. So the concern about eight months, nine months, there are cases that allow you to proceed to a jury on the basis of eight-month gap. But apart from that, with direct evidence, you don't worry about the circumstantial eight-month gap because you have direct evidence. The circumstantial evidence only comes into play when you don't have direct evidence. The issue about stereotyping, there's very few cases in this court about what the dog whistle language would be to allow a case like this to go to a jury. But I would suggest there's a larger principle already at play in this circuit, that issues surrounding, it comes up in hostile work environment cases. You allow the jury to determine whether certain comments are enough to create a hostile work environment because juries are in a better position than all of us to really know inferences surrounding issues like this. This court said so in Gallagher v. Delaney. This court said so in Razmi. If we're going to argue back and forth about what do these comments mean when Grant was the target of Mestrota's opening comments when she came on board as CEO, you know, that really should be for the jury to determine whether these are sufficiently stereotypical in light of the context. Would the simple fact of her firing be enough? Would the simple fact of his firing within 30 days be enough to plausibly claim racial discrimination? That's a much harder case. If we don't have anything else in the complaint other than she came aboard, 30 days later he's fired, I don't think that's a racial discrimination claim. But we have more than that. Let me ask you this. If the complaint said he was fired because his mother had been the CEO prior to her, would that be racial discrimination? We would need more than that. It's your view that you need more and that you have. Yes. And that it is? She barely knew him, and she's already targeting him as an incompetent, lazy employee who's overpaid and hasn't done anything positive for the place. She didn't say lazy. She said busy. She said he's- Because words matter here. Words matter here, Mr. Bergstein, because you're asking us to infer intent from the environment and the words used. And so we have to decide whether she was using language from which we could infer or plausibly infer that she harbored a discriminatory intent. Agreed. Go ahead. Agreed. So he's not present at the agency. He's not busy enough. He's dangerous. If we let him go, he'll destroy the computer infrastructure. She barely knows him. She's using-she's making comments that are not rooted in fact. Okay. And we have a disparate treatment. There's a comparable white employee who didn't suffer what Grant suffered. Okay. Thank you. Thank you to all of you. A reserved decision. Have a good day.